**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| ROBERT GEOFFREY DAVIS, | Case No. 2:23-cv-1208-APG-MDC |
| Petitioner, | **Order Denying Petition for Writ of Habeas Corpus and Granting a Certificate of Appealability** |
| v. | |
| MANUEL PORTILLO,[1] et al., | [ECF No. 22] |
| Respondents. | |

Petitioner Robert Geoffrey Davis filed a counseled second amended petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 22.  A jury convicted Davis of the first-degree murder of his brother, Matthew Garret Davis (Garre), and he was sentenced to 20 years to life imprisonment plus a consecutive two to five years for use of a deadly weapon. ECF No. 35-31. In the remaining grounds of his petition,[2] Davis alleges:

(1) prosecutorial misconduct in closing argument violated the Sixth and Fourteenth Amendments;

(2) ineffective assistance of trial counsel violated the Sixth and Fourteenth Amendments;

---

[1] Davis is currently incarcerated at Southern Desert Correctional Center (SDCC). *See* NDOC Inmate Search.  Manuel Portillo is the current warden for that facility. *See* Southern Desert Correctional Center Facility | Nevada Department of Corrections.  At the end of this Order, I direct the Clerk of Court to substitute Davis's current immediate custodian, Manuel Portillo, as the respondent in lieu of Gabriela Najera. *See* Fed. R. Civ. P. 25(d).

[2] I previously ruled Ground 1 of the petition is procedurally defaulted because Davis failed to federalize the claim in state court; however, I deferred my decision whether the claim should be dismissed until my review whether Davis could meet the requirements to overcome the procedural default. ECF No. 48 at 9.  Davis concedes he cannot overcome the procedural default. ECF No. 61 at 18.  Accordingly, I dismiss Ground 1 as procedurally defaulted.

(3) denial of his right to conflict-free counsel violated the Sixth and Fourteenth Amendments; and

(4) cumulative error violated due process under the Fifth and Fourteenth Amendments. ECF No. 22. As explained below, I deny the petition and grant a certificate of appealability for some of the grounds.

## I.   BACKGROUND

### A. Facts Underlying the Offense

In the early morning hours of Saturday, September 10, 2011, Davis shot and killed Garre at their residence in Mogul, Nevada. Davis lived in the front house while Garre lived upstairs over a barn behind the front house that was attached by an intervening breezeway. ECF Nos. 13-3 at 2; 35-21 at 170–175; 35-23 at 208–09. Garre was diagnosed with bipolar disorder, would get angry "for long periods of time," and was prescribed medication but rarely took it as he preferred illegal drugs. ECF Nos. 35-21 at 171–73, 189; 35-23 at 211. During the year before Garre's death, Garre beat Davis and broke his nose during an argument in the breezeway. ECF No. 35-23 at 208–09.

On the Friday before the shooting, Davis reported to Washoe County Sheriff's Department (WCSD) that Garre hit him during an argument in the garage. ECF No. 35-21 at 60–62. Davis said he retreated to a locked bathroom, but Garre broke down the door, hit Davis several times, and took Davis's cellphone when he attempted to dial 9-1-1. *Id.* Garre threatened to lock-up Davis, but Davis broke free and called 9-1-1 from a neighbor's house. *Id.*

When WCSD deputies arrived at the residence, Garre was running on the roof holding what looked like a lawnmower blade. *Id.* at 44–49, 52–60. Garre told the deputies, "Shoot me, shoot

me, shoot me," demanded they leave, and threatened to shoot and kill them with an AK-47, so the deputies left to let him "cool off." *Id.*

A WCSD deputy photographed an injury to Davis's chin, and another deputy dropped Davis off near a motel in South Reno so he could stay with a friend. *Id.* at 63–65, 78, 90–94, 104–06. Davis told the deputy who photographed his injuries that Garre punched him in the face, but he did not fight back as he just wanted to leave; however, had he wanted to fight Garre, he would have "beat the crap out of him." *Id.* Davis told the deputy who dropped him off about prior domestic batteries, that he was afraid of Garre, Garre was off his medication, and Garre threatened to kill him. *Id.* at 63–65, 78, 89–98. The deputy gave Davis a domestic violence information sheet and his business card. *Id.* at 65–67.

That evening, Davis met Deborah Ann Rouse at a bus stop and told her about the altercation with Garre, that Garre was not taking his medications, and he was embarrassed that Garre "bitch-slapped" him. *Id.* at 107–11, 116–17. Davis had been drinking and was friendly and smiling. *Id.* at 111, 115. Davis and Rouse exchanged telephone numbers on paper because Davis did not have his cellphone. *Id.* at 109–10. Rouse gave Davis bus options to return to Mogul. *Id.* at 113–14. Bank records indicated Davis later visited a bar. ECF No. 35-22 at 29–32.

Around 1:30 a.m., the brothers' mother, Donna, received a telephone call from Garre, who told her someone was trying to break into the house with a hatchet. ECF No. 35-21 at 173–75. Garre sometimes became paranoid and had a lot of delusions. *Id.* at 189. Donna told Garre to call the sheriff. *Id.* at 174.

Around that time, neighbor Clint Moxey awoke to two men having an argument, yelling, screaming, loud banging on a wall, and the sound of windows breaking at the Davis residence. *Id.* at 140–42. Moxey heard Garre say, "Give me my f*cking phone," and a person whom

3

Moxey assumed was inside, and whom he could not identify, say, "I don't have your f*cking phone." *Id.* at 145–48. Moxey heard windows break and the unidentified man, whom he assumed was inside, yell and scream, "Quit breaking my windows." *Id.* Moxey heard Garre say, "this isn't because I'm drunk," and heard the unidentified man whom he assumed was inside, threaten to call the police. *Id.* Moxey heard "one of them," and believed it was Garre, say, "I'm going to f*cking kill you." *Id.* at 148–49. Moxey said it was then "quiet for a little, a few minutes." *Id.* He then heard Garre say, "I've got something for you now," followed by the sound of gunfire. *Id.* at 148–49.

Neighbor Al Roper likewise heard a window break and two men arguing. ECF No. 35-23 at 174–76. He thought it sounded like someone wanted Garre out of the house as he thought he heard Garre ask to get his clothes and cellphone. *Id.* at 177–78, 181–82. Roper testified Garre "was kind of quiet" and then "came back and said something like I got—'Well, I got something for you,'" and as Garre started to say it again, Roper heard gunfire. *Id.* at 178, 186–87.

WCSD deputies arrived around 2 a.m. but did not enter the house as the location of the shooter was unknown. ECF Nos. 35-21 at 240–43; 35-22 at 10–12. They heard "banging come from the back of the house, and someone yelling for help" but were ordered to remain outside. *Id.* Paramedics arrived shortly after the 9-1-1 call but also stayed outside for the same reason. ECF No. 35-20 at 54. Around 4 a.m., a SWAT team arrived but no one entered the house until around 6:00 a.m. ECF No. 35-21 at 197–201. By the time they found Garre, he had died of exsanguination from a shotgun wound to his abdomen. *Id.* at 15, 22, 201, 218.

Around that same time, Davis called his mother, Donna, for a ride from Boomtown Resort Casino. *Id.* at 178–79. A resort security officer overheard Davis say into the telephone he could not return home because Garre was there, and Davis needed his wallet and a change of clothes

and wanted to rent a room. *Id.* at 166–68.  Resort surveillance captured Davis stating, "you'd think he'd have been arrested, but he is not." *Id.*  Davis told his mother, "I hope he dies soon. I really do." ECF No. 35-29 at 29, 77–78.[3]  When Donna picked up Davis, he "reeked of alcohol," and she attempted to take him home to pick up clean clothes but was turned away by the police who were at the scene of the shooting, and took him to her home, where he was soon detained by the WCSD. *Id.* at 178–80, 229–30, 235.

The medical examiner found in Garre's body, "four shotgun pellets," a green plastic shot shell cup, and cardboard consistent with shotgun shells. ECF Nos. 35-20 at 68–69; 35-23 at 10–11.  Garre's liver tissue tested positive for methamphetamine, amphetamine, metabolite of clonazepam, alprazolam, and metabolites of marijuana. ECF No. 35-21 at 13–14, 28.  In Davis's bedroom, deputies found his wallet and a domestic violence information sheet bearing Rouse's telephone number; a 12-gauge pump-action shotgun with a live round in the tube, but none in the chamber, was hidden in the crawlspace. ECF No. 35-22 at 153–60, 163–65, 202–07.

Glass shards and a concrete chunk were found in Garre's upstairs residence, along with holes in two of his upstairs windows. *Id.* at 78–82.  Also, in Garre's residence, deputies found a red cell phone, a .22 rifle with a loaded magazine but nothing in the chamber, and a can of "pepper spray." *Id.* at 94–101, 105, 111, 133, 181, 208.  An open window in Garre's living room looked onto the roof of the breezeway that separated Davis's house from the barn/Garre's house. *Id.* at 105–07.  A large pool of blood was found on the roof of the breezeway along with drops leading to Garre's window. *Id.* at 109–11.

---

[3] The trial transcript does not include a transcription of the phone call; however, during closing argument, the prosecutor and defense counsel each referenced the jury heard that statement in the audio tape of the telephone call.

Pepper spray, consistent with the can found in Garre's residence, was found on Davis's t-shirt and the crown of his baseball cap, which were found in Donna's trash can. ECF Nos. 35-22 at 47–53, 58–64; 35-23 at 44–51.  The pepper spray was found on the back left side, back left shoulder, back left sleeve, front left shoulder, front left sleeve, front right shoulder, front right sleeve, and "a little bit in the center area." ECF No. 35-23 at 89.  On the cap, there was pepper spray on the exterior crown, i.e., "front panel on your cap and the external bill area." *Id.* Forensics swabbed the barrel, magazine tube, and choke tube of the shotgun, and found "small, pinpoint-type fluorescence occurring in various areas on the gun" and concluded "that pepper spray was likely indicated . . .." *Id.* at 40–46.  It was estimated the shot that killed Garre was fired two to five yards away. *Id.* at 123.

**B.  Procedural History**

In June 2012, a jury found Davis guilty of first-degree murder of Garre with use of a deadly weapon, and Davis was sentenced to life imprisonment with the possibility of parole after 20 years and a consecutive term of imprisonment for 24 to 60 months for the use of a deadly weapon. ECF Nos. 34-6; 34-13.  In June 2014, the Supreme Court of Nevada reversed Davis's conviction after concluding the trial court erroneously allowed the introduction of statements obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). ECF No. 34-45.

At a second trial in September 2015, a jury again found Davis guilty of first-degree murder of Garre with use of a deadly weapon. ECF No. 35-27.  The trial court imposed the same sentence as was imposed after the first trial. ECF No. 35-31.  The Supreme Court of Nevada affirmed the judgment. ECF Nos. 35-35; 36-10.  The Nevada Court of Appeals affirmed the denial of Davis's state postconviction petition. ECF Nos. 36-45; 36-61.

/ / / /

## II.      GOVERNING STANDARDS

### A.  Antiterrorism and Effective Death Penalty Act (AEDPA)

The AEDPA sets forth the standard of review generally applicable in habeas corpus cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254 "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).  A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413).  "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly

established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed correct unless rebutted by clear and convincing evidence. The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### B. Standards for Evaluating Ineffective Assistance of Counsel (IAC)

IAC claims are governed by the two-part test announced in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner claiming IAC has the burden to demonstrate (1) the attorney made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense. *See Williams*, 529 U.S. at 390–91 (citing *Strickland*, 466 U.S. at 687).

To establish ineffectiveness, the defendant must show counsel's representation fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88. Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct, to avoid the distorting effects of hindsight. *See id.* at 689. The petitioner bears the burden to overcome the presumption that counsel's actions might be considered sound trial strategy. *See id.* Federal review of a state supreme court's decision on an IAC claim is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). The reviewing court must "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d).'" *Id.* (internal citations omitted). To

establish prejudice, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "probability sufficient to undermine confidence in the outcome." *Id.*

## III.    DISCUSSION

### A.  Constitutionality of 28 U.S.C. § 2254(d)

Davis alleges in his reply brief in support of his petition that 28 U.S.C. § 2254(d) is unconstitutional because it infringes separation of powers and the independence of the judiciary. ECF No. 61 at 8–18. Although he acknowledges the Ninth Circuit Court of Appeals previously rejected a constitutional challenge based on the separation of powers, *see Crater v. Galaza*, 491 F.3d 1119, 1126–29 (9th Cir. 2007), he argues that holding is irreconcilable with *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024). *Id.* He urges me to revisit the issue and conclude 28 U.S.C. § 2254(d) is unconstitutional. The respondents contend I should reject Davis's arguments. ECF No. 62 at 2–5.

In *Loper Bright*, the Supreme Court overruled *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), which concerned the deference owed by district courts to agency interpretations of ambiguous statutes. 603 U.S. at 378–79. Davis argues *Loper Bright* recognized federal courts may not abdicate their role in deciding questions of federal law; therefore, I should not be required to defer to the Nevada state courts on federal constitutional issues under AEDPA; rather, I should be able to exercise independent judgment when deciding legal questions. ECF No. 61 at 8–18.

While I might prefer to exercise my independent judgment on questions of federal constitutional law, I am bound to follow "controlling Supreme Court precedent until it is

explicitly overruled by that Court." *See United States v. Werle*, 35 F.4th 1195, 1201 (9th Cir. 2022) (quoting *Nunez-Reyes v. Holder*, 646 F.3d 684, 692 (9th Cir. 2011) (*en banc*)).  In *Loper Bright*, the Supreme Court did not explicitly (or implicitly) overrule or dilute AEDPA deference—or even discuss AEDPA at all. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("If a precedent of this Court has direct application in a case, . . . a lower court should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions. . . . This is true even if the lower court thinks the precedent is in tension with some other line of decisions." (internal quotation marks and citation omitted)).  Moreover, the Supreme Court has confirmed AEDPA's constitutionality. *See Brown v. Davenport*, 596 U.S. 118, 127 (2022) ("When Congress supplies a constitutionally valid rule of decision, federal courts must follow it.  In AEDPA, Congress announced such a rule.").  Accordingly, I reject Davis's constitutional challenge.

**B.  Ground 2—Prosecutorial Misconduct in Closing Argument**

Davis alleges the prosecutor violated the Sixth and Fourteenth Amendments in closing argument by presenting a PowerPoint slide bearing statements not supported by the evidence. ECF Nos. 13-2 at 2; 22 at 12–14.  He alleges the slide erroneously asserted (1) Davis was untruthful when questioned by Detective Palmer; (2) Davis "was armed" when he left after the shooting; and (3) Davis "alleged at REMSA [Regional Emergency Medical Services Authority] that he was staying away[,] [b]ut had been there and needed to go back to get the evidence that he was there and see what had happened." ECF Nos. 22 at 13; 35-20 at 46.  He alleges the first statement was from an illegal interrogation. ECF No. 61 at 20–21.  The respondents argue the state court's rejection of this claim is objectively reasonable. ECF No. 55 at 24–26.

/ / / /

### 1.  Additional Background

In closing remarks, the prosecutor presented the jury with a PowerPoint slide entitled "Consciousness of Guilt." ECF No. 13-2 at 2.  After the prosecutor's closing remarks, and outside the presence of the jury but before defense counsel's closing remarks, defense counsel objected to the statement contained in the slide, "The Defendant was untruthful when questioned by Detective Palmer." ECF No. 35-29 at 53.  Defense counsel requested the slide be "marked and preserved for the record" because "it should have never been brought before [the] jury." *Id.* The state court responded, "Understood . . . the record speaks for itself, and your argument now is on the record . . . I don't have to make a ruling on that. It was what it was . . .." *Id.* at 54.

### 2.  Standards for Evaluating Prosecutorial Misconduct

A petitioner is entitled to relief on a claim of prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  *See also Greer v. Miller*, 483 U.S. 756, 765 (1987) ("To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'") (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985) and *United States v. Agurs*, 427 U.S. 97, 108 (1976)). Factors to consider when determining whether a prosecutor's comment "rendered a trial constitutionally unfair" include, but are not limited to: (1) whether the comment misstated or manipulated the evidence; (2) whether the judge admonished the jury to disregard the comment; (3) whether defense counsel invited the comment; (4) whether defense counsel had an adequate opportunity to rebut the comment; (5) the prominence of the comment in the context of the entire trial; and (6) the weight of the evidence. *See Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir.

2010) (citing *Darden*, 477 U.S. at 181–82).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

### 3.  State Court Determination

On direct appeal, the Supreme Court of Nevada (SCON) held Davis failed to establish the alleged misconduct was plain error as the slide was shown briefly and Davis did not show actual prejudice or a miscarriage of justice:

> Generally, a defendant's failure to timely object to prosecutorial misconduct and request corrective instructions during trial precludes appellate consideration. *Rowland v. State*, 118 Nev. 31, 38, 39 P.3d 114, 118 (2002).  However, this court "may consider *sua sponte* plain error which affects the defendant's substantial rights." *Id.*  Here, the State briefly displayed a PowerPoint slide during its closing argument.  Outside the presence of the jury and after the slide was already viewed by the jury, Davis requested that the slide be "marked and preserved for the record" because "it should have never been brought before [the] jury."  Whether this constitutes a timely objection, however, is irrelevant because Davis concedes on appeal that he "did not seek a remedy" for the alleged prosecutorial misconduct at trial. Thus, we review the alleged misconduct for plain error.
>
> "In conducting plain error review, [this court] must examine whether there was 'error,' whether the error was 'plain' or clear, and whether the error affected the defendant's substantial rights. Thus, the burden is on the defendant to show actual prejudice or a miscarriage of justice." *Anderson. v. State*, 121 Nev. 511, 516, 118 P.3d 184, 187 (2005) (internal quotation marks omitted).  Here, the PowerPoint slide was briefly shown to the jury during closing argument and the defendant has not shown actual prejudice or a miscarriage of justice.  Thus, Davis has not met his burden under this court's plain error review. *See Taylor v. State*, 132 Nev., Adv. Op. 27, 371 P.3d 1036, 1037 (2016) (determining that the State's improper use of a PowerPoint slide was insufficient for a finding of error when "the slide was displayed briefly only at the very end of the prosecutor's closing arguments, and the defense did not object to the slide").

ECF No. 36-10 at 4–5.

The remark on the PowerPoint slide that Davis "was untruthful when asked what happened by Detective Palmer" is supported by Detective Palmer's trial testimony that, during a brief conversation with Davis at the ambulance where Davis was medically evaluated after he was detained at his mother's house, Davis told the detective he had an altercation with his brother and "he was just trying to stay away in the house," and that part of his staying away included going to his mother's house. ECF No. 35-22 at 22–23.  Reasonable inferences could be drawn that Davis was untruthful, e.g., police found his wallet and Rouse's telephone number in his bedroom, thus, demonstrating he had not stayed away from his house.  Contrary to Davis's assertion, those remarks were not ordered suppressed; the only suppressed remarks were those given to the detectives at the sheriff's station and the Carriage Inn. *See Davis v. State*, 130 Nev. 1169 (2014) (acknowledging "the district court suppressed his stationhouse statements" before the first trial, and holding the statements made at the Carriage Inn should have been suppressed).

There was no evidence at trial that supported the prosecutor's assertions that Davis "was armed" when he departed the shooting and Davis told Detective Palmer he "had been there and needed to go back to get the evidence that he was there and see what had happened (form and card)." ECF No. 13-2 at 2.  Defense counsel, however, had every opportunity to object contemporaneously, request a curative instruction, and refute those assertions when arguing to the jury in the defense closing remarks, but counsel did none of this.  The prosecutor, however, told the jury, "[Y]our recollection of the evidence is the one that controls.  Simply because I say it or read something off the screen doesn't make it so.  Your recollection controls." ECF No. 35-29 at 20–21.  The trial court also instructed the jury, "Nothing that counsel say during the trial apart from stipulations is evidence in the case." ECF No. 35-24 at 5.  Because a "[a] jury is

presumed to follow its instructions," it is not objectively unreasonable to conclude the unfounded remarks were not of sufficient significance to render the trial constitutionally unfair or so infect the jury with unfairness as to make the resulting conviction a denial of due process. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Darden*, 477 U.S. at 181.

Accordingly, I deny Ground 2 because the state court's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of the facts considering the evidence presented during the state court proceedings.

### C.  Ground 3—IAC

Davis alleges four claims that trial counsel provided ineffective assistance in violation of the Fifth, Sixth, and Fourteenth, Amendments. ECF No. 22 at 14–22.

#### 1.  Ground 3(a)—Failure to Argue Voluntary Manslaughter

Davis alleges trial counsel provided ineffective assistance by failing to argue for a voluntary manslaughter verdict. ECF No. 22 at 14–18.  He contends there was no reason to reject manslaughter as an alternative to self-defense or first-degree murder. *Id.*  He claims there was adequate provocation for manslaughter as neighbors heard Garre and Davis arguing for 20 minutes before a shot was fired and Davis had pepper spray on his clothes. *Id.*  The respondents contend Davis cannot establish he was prejudiced. ECF No. 55 at 27–31.

##### a.  Additional Background

In opening statements, trial counsel argued a self-defense theory, e.g., "It was more than reasonable to be afraid of Gar[re], the crazy man with a gun.  So, at the conclusion of this trial, we will ask that you find Geoff Davis not guilty of murder because it was reasonable for him to believe that he needed to defend himself at the time that Gar[re] was shot." ECF No. 35-20 at 28.

14

The jury was instructed that Davis was charged with Open Murder, which includes the offense of Murder in the First Degree and necessarily includes the lesser-included offenses of Murder in the Second Degree, Voluntary Manslaughter, and Involuntary Manslaughter, and that Davis could be convicted of only one of those offenses. ECF No. 35-24 at 29.  The jury was instructed at which point it must consider the lesser-included offenses. *Id.* at 29–30.  The jury was also instructed on the requirements of voluntary manslaughter based on a sudden heat of passion caused by a provocation:

> Manslaughter is the unlawful killing of a human being without malice express or implied, and without a mixture of deliberation. Manslaughter may be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible . . . .
>
> In cases of voluntary manslaughter, there must be a serious and highly provoking injury inflicted upon the person killing, sufficient to excite an irresistible passion in a reasonable person, or an attempt by the person killed to commit a serious personal injury on the person killing.
>
> The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for, if there should appear to have been an interval between the assault or provocation given for the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished as murder.
>
> The heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinary reasonable person in the same circumstances.  A defendant is not permitted to set up his own standard of conduct and to justify or excuse himself because his passions were aroused unless the circumstances in which he was placed and the facts that confronted him were such as also would have aroused the passion of the ordinary reasonable man, if likewise situated.  The basic inquiry is whether or not, at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinary reasonable person of average disposition to act rashly and without

deliberation and reflection, and from such passion rather than from judgment.

. . . .

In order to convict the defendant of murder in either the first or second degree, the State must prove beyond a reasonable doubt that the defendant did not act in the heat of passion upon sufficient provocation.

*Id.* at 24–28.

The prosecutor argued in closing, "[s]o you get to evaluate: Is it first, is it second, or is it a lessor type of killing, manslaughter or an involuntary manslaughter." ECF No. 35-29 at 47. The prosecutor argued, "we don't have adequate provocation," "[t]he phone was taken. I couldn't get it back by throwing rocks through the windows, so I'm going to get a gun. Not adequate provocation." *Id.* at 46–47. Defense counsel argued in closing that Davis was "not guilty of murder" and "not guilty of manslaughter." *Id.* at 87. Counsel argued that if the police were justifiably afraid of Garre, then Davis was too. *Id.* at 88. Counsel argued Davis acted in self-defense: when faced with pepper spray, he responded with a firearm, and had no way of knowing whether Garre, who was on the roof in the dark, had anything more than pepper spray. *Id.* at 87.

In state postconviction proceedings, trial counsel testified the defense "wanted [the State] to accept a manslaughter" plea, and Davis declined the State's offer for a plea to second-degree murder. ECF No. 36-40 at 11–12. Although the jury was instructed how to evaluate the lesser-included offenses, counsel testified she did not argue them; instead, she argued Davis was reasonable to fear Garre and acted in self-defense. *Id.* at 11–12.

### b. State Court Determinations

On postconviction review, the Nevada Court of Appeals (NCA) considered the claim that trial counsel was ineffective for failing to object to an incomplete murder instruction regarding the heat of passion necessary to reduce murder to manslaughter. ECF No. 36-61 at 2–4. Along

16

the way, the NCA determined trial counsel was not ineffective for failing to argue for a verdict of voluntary manslaughter because counsel made a strategic decision to seek acquittal based upon a theory of self-defense, and Davis failed to establish a reasonable probability of a different outcome had counsel argued that theory:

> Davis claimed that his trial counsel were ineffective for failing to argue that the jury instruction concerning a willful, deliberate, and premeditated killing was erroneous. Davis contended that the relevant instruction failed to properly explain, as required by *Byford v. State,* 116 Nev. 215, 236, 994 P.2d 700, 714 (2000), the heat of passion necessary to reduce murder to voluntary manslaughter. Davis also appeared to assert that the instructional error was compounded by counsel's failure to argue in closing that he acted under the heat of passion.

> The *Byford* court explained that instructions concerning a willful, deliberate, and premeditated killing should state that "in all cases the [deliberate] determination must not be formed in passion, or if formed in passion, it must be carried out *after there has been time for the passion to subside and deliberation* to occur." *Id.* (emphasis added). The instruction in this matter contained an error as it omitted the portion of the instruction italicized above. Despite the erroneous instruction, Davis did not demonstrate prejudice stemming from the error.

> The district court conducted an evidentiary hearing concerning a different claim, but testimony relevant to this issue was produced at that hearing. During her testimony at the evidentiary hearing, counsel explained her decision to argue for finding Davis not guilty of both murder and voluntary manslaughter. Counsel testified that she reviewed the facts and thought that it was reasonable for Davis to be afraid of the victim and, thus, to have acted in self-defense. Counsel stated that based on the circumstances of this case, she did not argue at trial that Davis should be found guilty of any of the lesser-included offenses of first-degree murder but rather that he should be found not guilty because he reasonably acted in self-defense.

> Counsel's testimony demonstrated that it was a strategic decision to seek acquittal based upon a theory of self-defense rather than argue that Davis acted under a heat of passion and was thus guilty of voluntary manslaughter. Trial counsel's strategic decisions are "virtually unchallengeable absent extraordinary

17

circumstances," *Lara v. State,* 120 Nev. 177, 180, 87 P.3d 528, 530 (2004) (internal quotation marks omitted), and Davis did not demonstrate that extraordinary circumstances existed in this matter, *see Ennis v. State,* 122 Nev. 694, 704–05, 137 P.3d 1095, 1102 (2006) ("In order to avoid the distorting effects of hindsight, the evaluation begins with the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (internal quotation marks omitted)).

In light of counsel's strategic decision and the circumstances surrounding the killing, Davis failed to demonstrate a reasonable probability of a different outcome at trial had counsel objected to the instruction concerning the heat of passion necessary to reduce murder to voluntary manslaughter or argued that theory to the jury. *See Harrington v. Richter,* 562 U.S. 86, 112 (2011) (explaining that under the *Strickland* prejudice standard, "[t]he likelihood of a different result must be substantial, not just conceivable"). Therefore, we conclude that the district court did not err by denying this claim without considering it at the evidentiary hearing.

ECF No. 36-61 at 2–4.

### c. Standard of Review

The parties previously presented this claim as unexhausted and procedurally defaulted, and I deferred consideration whether Davis can overcome the procedural default under *Martinez v. Ryan*, 566 U.S. 1 (2012).[4] ECF No. 48 at 3–6. However, as can be seen by the NCA's affirmance set forth above, the claim raised by Ground 3(a) was exhausted. *See Casey v. Moore*, 386 F.3d 896, 916 n.18 (9th Cir. 2004) (noting "[a] claim is exhausted if the State's highest court expressly addresses the claim, whether or not it was fairly presented.") (citing *Castille v.*

---

[4] A petitioner can overcome procedural default of a claim of ineffective assistance of trial counsel by showing: (1) the claim of "ineffective assistance of trial counsel" is a "substantial" claim; (2) "cause" consists of "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding for the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding." *See Trevino v. Thaler*, 569 U.S. 413 (2013) (quoting *Martinez*, 566 U.S. 1).

*Peoples*, 489 U.S. 346, 351 (1989)).  In particular, the claim is rendered exhausted by the NCA's determinations that "[c]ounsel's testimony demonstrated that it was a strategic decision to seek acquittal based upon a theory of self-defense rather than argue that Davis acted under a heat of passion and was thus guilty of voluntary manslaughter," that "[t]rial counsel's strategic decisions are 'virtually unchallengeable absent extraordinary circumstances,'" "Davis did not demonstrate that extraordinary circumstances existed in this matter," and "Davis failed to demonstrate a reasonable probability of a different outcome at trial had counsel . . . argued that theory to the jury." ECF No. 36-61 at 3–4.

As explained below, I accordingly deny the claim on deferential review.  Alternatively, I deny the claim because, based on the reasons stated by the NCA and in my analysis below, even if Davis can overcome the procedural default of this claim under *Martinez*, and even if I apply *de novo* review, Davis has not established trial counsel was ineffective under *Strickland*. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (explaining a federal habeas court can "deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.").

### d.  Analysis of Ground 3(a)

The state court's deference to trial counsel's strategic decision—to seek acquittal based upon a theory of self-defense, rather than argue that Davis acted under a sudden heat of passion and was thus guilty of voluntary manslaughter—is objectively reasonable. *See Strickland,* 466 U.S. at 689.

"[A] defendant in a criminal proceeding may assert inconsistent defenses." *United States v. Spentz*, 653 F.3d 815, 818 (9th Cir. 2011).  However, the fact that counsel could argue alternative

theories, e.g., if not self-defense, then voluntary manslaughter, does not necessarily render unreasonable counsel's decision to pursue only self-defense. *See, e.g., Turk v. White,* 116 F.3d 1264, 1266–67 (9th Cir. 1997) (holding defense counsel is permitted to choose between two available yet conflicting defenses); *United States v. Stern,* 519 F.2d 521, 524–25 (9th Cir. 1975) (holding failure to pursue an insanity defense which conflicted with principal defense theory not ineffective assistance of counsel).  Additionally, a defense attorney can opt, where reasonable, for an "all-or-nothing" strategy, rather than argue for a lesser offense, thereby forcing the jury to choose between convicting on a severe offense and acquitting the defendant altogether. *See Crace v. Herzog*, 798 F.3d 840, 852 (9th Cir. 2015).

Here, the evidence of first-degree murder was not weak.  The jury heard Davis tell his mother, several hours after the shooting, "I hope he dies soon. I really do." ECF No. 35-29 at 29, 77–78.  And from the circumstances, the jury could infer Davis was the original aggressor and harbored malice aforethought given his dangerous use of the firearm.

Counsel argued in closing arguments that Davis acted in self-defense because, when faced with pepper spray, he responded with a firearm, as he had no way of knowing whether Garre, who was on the roof in the dark, had anything more than pepper spray. ECF No. 35-29 at 87. Based on the trial evidence, including the presence of the shotgun, counsel could have concluded the volume of evidence demonstrating Davis had a legitimate fear of Garre made his bringing the shotgun to the argument and the self-defense theory more palatable than a sudden-heat-of-passion defense.  If the purpose was to obtain an acquittal, then argument for voluntary manslaughter would undermine the argument for self-defense, and problems with a self-defense theory do not make counsel's strategy unreasonable. *See Williams v. Woodford,* 384 F.3d 567, 611 (9th Cir. 2004) (after selecting a reasonable defense, counsel has no duty to investigate

conflicting defenses).  Additionally, although counsel argued for self-defense, counsel was aware the jury instructions kept the prospect of a voluntary manslaughter verdict in play should the jury determined the State failed to prove first- or second-degree murder and disprove self-defense.

Davis claims counsel should have realized a self-defense theory would not work because it did not work at the first trial. ECF No. 22 at 14–15.  However, trial counsel testified the self-defense theory was stronger than during the first trial due to the suppression of Davis's statements to WCSD and law enforcement testimony at the second trial showing it was reasonable for Davis to fear Garre. ECF No. 36-40 at 10–11.  Although counsel was aware the jury would be skeptical Davis acted in self-defense because he brought, and loaded, the shotgun, counsel would have the same concern if counsel chose a voluntary manslaughter theory and argued Davis shot his brother in a sudden heat of passion. *Id.* at 28.

Even assuming counsel's failure to argue for voluntary manslaughter fell below an objective standard of reasonableness, Davis has failed to demonstrate a reasonable probability of a different outcome at trial had counsel argued a voluntary manslaughter theory.  First, this is not an instance where counsel was ineffective for failing to ensure the jury was instructed on a lesser-included offense.  Here, the jury found Davis guilty of first-degree murder even though it was instructed (1) regarding the requirements for voluntary manslaughter; (2) that if it did not find Davis guilty of first- or second-degree murder or that he acted in self-defense, it could find him guilty of voluntary manslaughter; and (3) in order to convict Davis of first-degree murder, the State must prove Davis did not act in the heat of passion upon sufficient provocation. ECF No. 35-24 at 24–30, 41.  Thus, even in the absence of counsel's argument, the jury had to necessarily reject voluntary manslaughter before it could convict Davis of first-degree murder. Second, Davis argues he is prejudiced because "[a]ny juror could have concluded [Davis] fired at

21

Garre as a knee-jerk response to getting hit with pepper spray, thereby satisfying adequate provocation warranting voluntary manslaughter." ECF No. 61 at 26.  It is not enough, however, "to show that the errors had some conceivable effect on the outcome of the proceeding"; rather, it must be shown that, but for counsel's unprofessional error, there is a reasonable probability of a different outcome at trial. *See Harrington*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 693).

Davis's reply brief argues trial counsel's decision to pursue the self-defense theory was unreasonable because counsel failed to fully investigate and obtain evidence of Garre's mental health (as part of the claim that Davis was denied the right to conflict-free counsel in Ground 4). ECF No. 61 at 23–25.  The respondents contend Davis never made this argument in Ground 3(a) of the second amended petition. ECF No. 62 at 10 (*Compare* ECF Nos. 22 at 14–18; 61 at 23–24).  The respondents also argue I should not entertain Davis's attempt to add new evidence and allegations to Ground 3(a). *Id.* (citing *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  I agree with the respondents.  Davis did not raise a claim in Ground 3(a) that trial counsel's decision to pursue the self-defense theory was unreasonable because counsel failed to investigate Garre's mental health. ECF No. 22 at 14–18.  Accordingly, I will not consider that claim.

For the reasons explained above, Ground 3(a) is denied.

### 2.  Ground 3(b)—IAC—Failure to Challenge Self-Defense Instruction

Davis alleges trial counsel provided ineffective assistance by failing to object that the jury instruction for self-defense improperly omitted language set forth in *Runion v. State*, 116 Nev. 1041, 1051 (2000): "However, where a person, without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, he has the right to stand his ground and need not retreat when faced with the threat of deadly force." ECF

No. 22 at 18–19.  The respondents argue the NCA's determination that counsel was not ineffective is objectively reasonable. ECF No. 55 at 31–33.

In *Runion*, the SCON directed trial courts to "cease merely quoting the applicable statutes when instructing a jury on self-defense" because "not all aspects of the self-defense statutes will be applicable in each case." *Runion*, 116 Nev. at 1050–51.  The SCON provided "sample instructions for consideration" where a criminal defendant asserts self-defense. *Id.*  However, the SCON cautioned, "[w]hether these or other similar instructions are appropriate in any given case depends upon the testimony and evidence of that case.  The district courts should tailor instructions to the facts and circumstances of a case, rather than simply relying on 'stock' instructions." *Id.*  The sample instructions given in *Runion* include:

> The right of self-defense is not available to an original aggressor, that is a person who has sought a quarrel with the design to force a deadly issue and thus through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.
>
> However, where a person, without voluntarily seeking, provoking, inviting, or willingly engaging in a difficulty of his own free will, is attacked by an assailant, he has the right to stand his ground and need not retreat when faced with the threat of deadly force.

*Id.*  In Davis's case, the jury was instructed:

> The right of self-defense is not available to an original aggressor, that is a person who has sought a quarrel with the desire to force a deadly issue and thus though [sic] his fraud, contrivance or fault, to create a real or apparent necessity for making felonious assault.
>
> A person is not required to retreat before using deadly force, even if retreat can safely be made, so long as the person:
>
> (1) Is not the original aggressor;
>
> (2) Has a right to be present at the location where deadly force is used; and

23

> (3) Is not actively engaged in conduct in furtherance of
> criminal activity at the time deadly force is used.

ECF No. 35-24 at 37–38.

Applying *Strickland* on postconviction review, the NCA concluded trial counsel was not ineffective because the instructions correctly explained the law regarding self-defense and circumstances that justify deadly force without retreating, and there is no reasonable probability of a different outcome had counsel requested the alternative instruction:

> The challenged instructions correctly explained the law regarding
> the use of self-defense and the circumstances in which a person is
> justified in using deadly force without retreating. Accordingly,
> Davis did not demonstrate that his counsel's performance fell
> below an objective standard of reasonableness by failing to object
> to the challenged instructions or a reasonable probability of a
> different outcome had counsel done so. Therefore, we conclude
> that the district court did not err by denying this claim without
> considering it at the evidentiary hearing.

ECF No. 36-61 at 5.

The NCA's determination is neither contrary to nor constitutes an unreasonable application of *Strickland*. The suggested language in *Runion* was not required; rather, as the SCON stated in *Runion*, the instructions must be tailored to the facts and circumstances of a case. *Runion*, 116 Nev. at 1051. Here, the instruction given to the jury was tailored to the facts and circumstances of the case. The evidence suggested Davis may have been on the ground while Garre was on the roof. A reasonable attorney could have foreseen the jury would ask why Davis didn't walk away from the argument or from the pepper spray assault. Unlike the stock instruction suggested in *Runion*, the instruction at Davis's trial addressed Davis's right to stand his ground by explaining that, under certain conditions, he was not required to retreat even if it was safe to do so. It was thus objectively reasonable to conclude counsel's failure to request the stock language did not fall below an objective standard of reasonableness under the circumstances. To the extent Davis

24

claims the instructions on self-defense were erroneous, I must defer to the SCON, as the final arbiter of state law, with respect to the requirements for self-defense instructions. *See Mullaney v. Wilbur*, 421 U.S. 684 (1975) (stating the Supreme Court "repeatedly has held that state courts are the ultimate expositors of state law" unless a state-court interpretation of state law "appears to be an 'obvious subterfuge to evade consideration of a federal issue.'").  Given the instruction to the jury was tailored to the circumstances of Davis's case and accurately stated the law in Nevada, there is no reasonable probability the result of the trial would have been different but for counsel's failure to propose the alternative language in *Runion*.  Ground 3(b) is denied.

### 3.   Ground 3(c)—IAC—Failure to Object to Murder Instruction

Davis alleges trial counsel were ineffective for failing to challenge the jury instruction for murder on the ground that it failed to explain the heat of passion necessary to reduce murder to voluntary manslaughter as required by *Byford v. State*, 116 Nev. 215 (2000). ECF No. 22 at 19–20.  The respondents contend Davis fails to show trial counsel was ineffective by choosing to pursue a self-defense theory rather than a heat-of-passion defense. ECF No. 55 at 33–34.

At trial, the instructions for first-degree murder stated first-degree murder "is perpetrated by means of any kind of willful, deliberate, and premeditated killing," and each of those elements must be proven beyond a reasonable doubt. ECF No. 35-24 at 22.  The instructions on the element of deliberation stated:

> Deliberation is the process of determining upon a course of action to kill as the result of thought, including weighing the reasons for and against the action and considering the consequences of the action.
>
> A deliberate determination may be arrived at in a short period of time.  But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out to occur.  A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill.

25

*Id.* In *Byford*, however, the complete instruction for the second sentence of the second paragraph reads, "But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur." *Byford*, 116 Nev. at 236.

As explained earlier, trial counsel argued in closing that Davis was not guilty of manslaughter or murder because he acted in self-defense. ECF No. 35-29 at 87.  The jury was nonetheless instructed on the heat of passion necessary to reduce a homicide to manslaughter: "[m]anslaughter is the unlawful killing of a human being without malice express or implied, and without a mixture of deliberation," and "may be voluntary, upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible," and "[t]he heat of passion which will reduce a homicide to manslaughter must be such a passion as naturally would be aroused in the mind of an ordinary reasonable person in the same circumstances," and "[i]n order to convict the defendant of murder in either first- or second-degree, the State must prove beyond a reasonable doubt that the defendant did not act in the heat of passion upon sufficient provocation." ECF No. 35-24 at 26.  The jury was furthermore instructed to consider "all the instructions as a whole and to regard each in the light of all the others." *Id.* at 3.

As set forth verbatim in the discussion of Ground 3(a), the NCA, applying *Strickland*, held that, although the murder instruction was incomplete, trial counsel's performance was not prejudicial as counsel made a strategic decision to seek acquittal based upon a theory of self-defense, rather than argue Davis was guilty of voluntary manslaughter by acting under a heat of passion. ECF No. 36-61 at 2–4.

Davis argues that omitted instructional language from *Byford* mattered here because, without it, the jury was not allowed to consider whether a heat of passion affected Davis and, if so,

26

whether enough time had passed for the passion to subside for the jury to convict him of first-degree murder. ECF No. 61 at 31.  But the jury was instructed that, to convict Davis of manslaughter based upon a finding that he acted in the heat of passion, it would need to find no interval between the provocation sufficient for the voice of reason and humanity to be heard:

> The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for, if there should appear to have been an interval between the assault or provocation given for the killing, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge and punished as murder.
>
> . . . .

ECF No. 35-24 at 25.  Based on the jury instructions, there is no reasonable probability the outcome of the trial would have been different, but for counsel's failure to request the omitted portion of the *Byford* instruction explaining that the element of deliberation required that the killing "be carried out after there has been time for the passion to subside and deliberation to occur."

I deny Ground 3(c) because the NCA's determination that counsel was not ineffective in failing to object to the incomplete instruction is neither contrary to nor constitutes an unreasonable application of *Strickland* and is not based an unreasonable determination of fact considering the evidence presented in the state court proceedings.

### 4. Ground 3(d)—IAC—Failure to Argue for a Lower Sentence

Davis alleges trial counsel provided ineffective assistance at sentencing by failing to (1) request a sentence for a term of 20 to 50 years imprisonment for the first-degree murder conviction, rather than 20 years to life, and (2) argue Garre subjected Davis to domestic abuse and the actions and inaction of law enforcement contributed to Garre's death. ECF No. 22 at 20–

22. The respondents contend the NCA's rejection of this claim is objectively reasonable. ECF No. 55 at 34–36.

A person convicted of noncapital first-degree murder in Nevada can be sentenced to imprisonment for (1) life without the possibility of parole; (2) life with the possibility of parole, with eligibility for parole beginning when a minimum of 20 years has been served; or (3) a definite term of 50 years, with eligibility for parole beginning when a minimum of 20 years has been served. NRS § 200.030(4)(b).

At sentencing, Davis's mother testified, "I feel strongly that if Washoe County Sheriff's Department had done their job the day before, both boys would still be alive." ECF No. 35-30 at 10. She testified, "My son Gar[re] was abusive towards [Davis]. He harassed and attacked him frequently" and "[Davis] was never the aggressor. He was the victim of domestic violence." *Id.* Davis's sister testified, "Everyone was afraid of [Garre]. [Garre] was not allowed to know where I lived, nor was he welcome in my home," and "[h]ad law enforcement not been so afraid of Matthew Garrett Davis, he would and should have been arrested on September 9th, 2011, according to the law." *Id.* at 12. She stated Davis went home "thinking law enforcement had performed their job according to the law," asked rhetorically, "why would [Garre] be there, had law enforcement followed protocol," and stated "[t]his was [Davis's] home. He should have felt safe in his home." *Id.*

The Presentence Investigation Report recommended 20 years to life for the first-degree murder conviction. ECF No. 56-3. Trial counsel argued for imposition of "the life-with-parole sentence that's available for the conviction for murder in the first degree and the lowest sentence available for the use of a deadly weapon." ECF No. 35-30 at 6–8. Counsel argued two "primary areas of mitigation": "the circumstances of the offense" and "[h]e is someone who is not a

troublemaker in custody." *Id.* at 7–8.  The State argued for imposition of the same sentence the court imposed after the first trial: 20 years to life and 24 to 60 months for the use of a deadly weapon. *Id.* at 14–15.  The trial court stated it was "constrained by the law" and in Davis's particular case, two juries convicted him of the crime. *Id.* at 16.  The trial court imposed the same sentence it had imposed following the first trial. *Id.* at 16–17.

Applying *Strickland* on postconviction review, the NCA concluded Davis failed to establish trial counsel's performance was deficient or prejudicial:

> [D]avis claimed that his trial counsel were ineffective for urging the district court to impose a sentence with a maximum term of life rather than 50 years.  At the sentencing hearing, counsel urged the district court to consider the tragic circumstances of this matter and that the victim had caused others to be afraid of him.  Counsel also requested the district court to consider Davis' good behavior during his time in custody.  Counsel ultimately requested the district court to impose a sentence of life in prison with the possibility of parole for the murder conviction and the minimum available sentence for the deadly weapon enhancement.  Davis did not demonstrate that counsel's performance during the sentencing hearing fell below an objective standard of reasonableness.  Davis also did not demonstrate a reasonable probability of a different outcome had counsel requested a different sentence.  Therefore, we conclude that the district court did not err by denying this claim without considering it at the evidentiary hearing.

ECF No. 36-61 at 6–7.

Davis complains trial counsel were ineffective for failing to seek a lesser sentence based on other contributing factors in Garre's death and that counsel provided no mitigation.  During the second jury trial, the trial court heard evidence about Garre's mental illness; Garre's unwillingness to take prescribed medications; Garre's willingness to take illegal drugs; Garre had methamphetamine and other drugs in his body at the time of his death; Garre beat Davis on two occasions, including the afternoon before the killing; Garre previously broke Davis's nose;

Davis, his mother, his sister, and law enforcement were afraid of Garre; and neighbors regularly witnessed Garre acting out and shouting and yelling. Counsel was aware that, despite a pretrial ruling, the trial court was aware Garre broke his sister's nose. At sentencing, Davis's mother and sister each testified about Garre's behavior and their belief that law enforcement is, in part, to blame for Garre's death. Under the circumstances, the NCA's determination that counsel's performance was not deficient or prejudicial is objectively reasonable.

Davis also complains trial counsel should have requested a sentence of 20 to 50 years imprisonment based on Garre's violent history and Davis's good behavior while incarcerated, and there was no reason for counsel's stipulation to the State's recommended sentence. ECF No. 61 at 34. Davis was resentenced only three years after imposition of the original sentence following the first trial. An objectively reasonable attorney could conclude it was futile to ask for a term of years when Davis was sentenced only three years after the original sentence. Notwithstanding Davis's good behavior in prison, it was for a relatively short period of time and two juries convicted him of the same offense. Thus, it was reasonable to conclude Davis has not demonstrated counsel's performance fell below an objective standard of reasonableness or prejudice.

I deny Ground 3(d) because the NCA was objectively reasonable in its determination Davis has not demonstrated counsel was ineffective at sentencing.

### D.   Ground 4—Violation of Right to Conflict-Free Counsel

Davis alleges the state courts deprived him of his right to conflict-free counsel because, for his second trial, he was represented by attorneys working for the Washoe County Public Defender's Office (WCPD) and attorneys from that office previously represented Garre in two misdemeanor cases. ECF No. 22 at 22–27. The respondents argue deference is owed to the

NCA's determination that Davis fails to establish there was a conflict-of-interest or that counsel's performance was adversely affected by the prior representation. ECF No. 55 at 37–39.

Davis seeks to add support for this claim with evidence not contained in the state-court record. I previously held Davis acted diligently to develop the state-court record and I would review Ground Four based on the same record that was before the NCA unless Davis satisfies the requirements of § 2254(d) and I were to conduct *de novo* review of this claim. ECF No. 48 at 9. As explained below, I deny the claim on deferential review of the state court's determinations and therefore need not consider Davis's additional evidence.

### 1.   Additional Background

In December 2014, following remand for a new trial, trial counsel filed notices of appearances on behalf of Davis that disclosed they were attorneys at WCPD. ECF Nos. 35-7; 35-8. At a status hearing on December 17, 2014, Davis's appellate counsel (following the first trial) appeared alongside the public defenders. ECF No. 35-9 at 3. Davis's appellate counsel stated the public defenders indicated there was no conflict of interest, but if that was not the case, appellate counsel wished to remain on the case. *Id.* at 4–5. The public defenders confirmed there was no conflict of interest, and the trial court allowed them to substitute in as trial counsel for Davis's second trial. *Id.*

Without moving to disqualify the public defender, the State later brought to the court's attention that the representation by the public defender should be fully vetted, and the state court held a hearing to determine whether a conflict of interest disqualified the public defenders from representing Davis at his second trial. ECF No. 35-16 at 4, 19. The state court summarized the proceedings before the first trial concerning the public defender's conflict of interest:

> THE COURT: Let me set the record.  We were here last time on a
> Motion to Confirm and [the prosecutor] briefed the issue that

previously the public defender's office had been appointed to the case prior to the last trial we did in this matter, and that they had conflicted off.  And due to some new policies, that I'm sure we will hear about in a moment, the public defender's office this time around did not have a conflict of interest in their legal opinion.

However, we learned during additional canvass that the conflict was that the public defender's office and another representative of the public defender's office had represented the victim in this case.  And, obviously, the victim is deceased.  However, the issue was raised by [defense counsel] that it is possible that a potential self-defense issue, it would be of interest as to what the victim's activities were that warrant the representation by the public defender's office initially which presented the conflict of interest that brought other lawyers on for trial number one.  So I think I've set the record correctly.  Have I, [prosecutor]?

[THE STATE]: I believe so, Your Honor.

THE COURT: And, [defense counsel]?

[DEFENSE COUNSEL]: Your Honor, that's what [co-defense counsel] advised me of.  She was here last week.

*Id.* at 4–5.  Davis's trial attorneys confirmed Davis had private counsel for the first trial because the WCPD had a conflict of interest. *Id.*  Counsel explained that, after the SCON decided *State v. Eighth Jud. Dist. Ct. (Zogheib)*, 130 Nev. 158, 165 (2014), the WCPD policies changed so that they would be consistent with that opinion. *Id.* at 5–6.  Counsel explained "the representatives from our office have not described or discussed the information that they gleaned from the representation of the decedent with me or [co-counsel] or the investigator, nor will they." *Id.*  Counsel explained she might use information about two prior cases involving Davis and his sister as victims but would not use information about a third case involving a third victim that was resolved through Mental Health Court as counsel did not believe they had a right to address that and was not planning to do so. *Id.* at 5–8.

32

The State expressed concern that, "somehow later down the road," if Mr. Davis was convicted again, he might say, "Hey, you knew stuff, if you could learn it somehow through habeas counsel or the like relating to Garrett that you didn't tell me that would have been useful," and "therefore, you weren't as effective as you could have been." *Id.* at 13.

The Washoe County Public Defender appeared at the hearing and assured the trial court that there were no open cases with a current witness for Davis's trial and "[t]he attorneys that sit here today are in no different position than private attorneys. They will need to gather their impeachment and whatever attacks, whatever theories they want to develop, based upon public record." *Id.* at 8–14. The trial court was satisfied that no conflict of interest existed and the public defenders could proceed as trial counsel for Davis. ECF Nos. 35-16 at 14–16; 35-17.

## 2. Standards for Evaluating Conflict-Free Counsel

"The Supreme Court has held that a criminal defendant has a constitutional right to assistance of conflict-free counsel." *Houston v. Schomig*, 533 F.3d 1076, 1081 (9th Cir. 2008) (citing *Strickland*, 466 U.S. at 688). "Where the conflict stems from counsel's representation of multiple defendants, the petitioner 'must establish that an actual conflict of interest adversely affected his lawyer's performance.'" *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). "The Supreme Court has defined an 'actual conflict' by the effect a potential conflict had on counsel's performance." *Id.* (citing *Mickens v. Taylor*, 535 U.S. 162, 171 (2002)). Potentially divided allegiances do not constitute active representation of conflicting interests. *See Paradis v. Arave*, 130 F.3d 385, 391 (9th Cir. 1997). To show an adverse effect, a petitioner must show "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the

attorney's other loyalties or interests." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (quoting *United States v. Stantini*, 85 F.3d 9, 16 (2d Cir. 1996)).

"Where defense counsel timely points out a conflict of interest in joint representation, the trial court is required to investigate further; ignoring counsel's objection mandates automatic reversal of the resulting conviction." *Houston*, 533 F.3d at 1081 (citing *Holloway v. Arkansas*, 435 U.S. 475, 488 (1978)). "When counsel objects to potentially conflicted representation, the trial court has an opportunity to eliminate the possibility of an impact on counsel's performance through seeking a waiver from the defendant, appointing separate counsel, or taking adequate 'steps to ascertain whether the risk [is] too remote to warrant separate counsel.'" *Alberni v. McDaniel*, 458 F.3d 860, 870 (9th Cir. 2006) (citing *Mickens*, 535 U.S. at 173; *Holloway*, 435 U.S. at 484).

Conflicts can arise from successive representation, particularly when a substantial relationship exists between the cases, such that the "factual contexts of the two representations are similar or related." *See Houston*, 533 F.3d at 1081 (quoting *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980) and *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir. 1989)). However, "[t]he Supreme Court has never applied the ethical imputed disqualification rule in Sixth Amendment analysis." *Lambert v. Blodgett*, 393 F.3d 943, 986 (9th Cir. 2004). Some courts have held successive representation of defendants with adverse interests by different attorneys at a public defender's office does not create an actual conflict. *See, e.g. United States v. Trevino*, 992 F.2d 64, 66 (5th Cir. 1993); *Salam v. Lockhart*, 874 F.2d 525, 527–28 (8th Cir. 1989). And the Supreme Court of Nevada has held "[a]n individual prosecutor's conflict of interest may be imputed to the prosecutor's entire office in extreme cases," and "the appropriate inquiry is whether the conflict would render it unlikely that the defendant would receive a fair

34

trial unless the entire prosecutor's office is disqualified." *Eighth Jud. Dist. Ct. (Zogheib)*, 130 Nev. at 164–65.

### 3. State Court's Determinations

On postconviction review, the NCA determined Davis did not demonstrate his trial counsel's performance was adversely affected by the WCPD Office's previous representation of Garre:

> [D]avis claimed that his trial counsel, who were deputy public defenders, were ineffective because they had a conflict of interest as the Public Defender's Office previously represented the victim in a prior, unrelated case. Davis asserted that the office had information concerning the victim that may have been helpful to his defense and that loyalty to a prior client may have hindered his counsel's ability to utilize that information.

> "Conflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case. In general, a conflict exists when an attorney is placed in a situation conducive to divided loyalties." *Clark v. State,* 108 Nev. 324, 326, 831 P.2d 1374, 1376 (1992) (quoting *Smith v. Lochhart,* 923 F.2d 1314, 1320 (8th Cir. 1991)). A conflict of interest exists if "counsel 'actively represented conflicting interests'" and the "conflict of interest adversely affected [the defendant's] lawyer's performance." *Strickland,* 466 U.S. at 692 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 348 [sic] (1980)). The trial court had conducted a hearing concerning this issue.

> The attorneys assigned to represent Davis explained that they did not personally represent the victim in the prior case and information their office possessed stemming from that case would be screened from them. Counsel also explained that they would have to discover relevant information related to the victim independent of the files stemming from the prior case but that any helpful information discovered concerning the victim would be permissible for them to use in Davis's defense. The trial court subsequently concluded that Davis's counsel could represent him.

> Davis did not demonstrate that counsel's performance was adversely affected by the Public Defender's Office's previous representation of the deceased victim. At trial, Davis pursued a self-defense strategy, and counsel argued at length that Davis acted in a reasonable manner given the victim's actions. In light of the

35

circumstances in this matter, Davis failed to demonstrate he was entitled to relief based on this claim. Therefore, we conclude the district court did not err by denying this claim without considering it at the evidentiary hearing.

ECF No. 36-61 at 5–6.

**4. Analysis of Ground 4**

It is objectively reasonable to conclude Davis did not demonstrate his counsel's performance was adversely affected by the WCPD Office's prior representation of Garre. As required by the Supreme Court, the trial court investigated the alleged conflict of interest and determined no actual conflict existed. *See Holloway*, 435 U.S. at 488. There is no evidence the public defenders who personally represented Davis at his second trial had personally represented Garre, or had, or could, obtain confidential information, including Garre's psychiatric history, from the public defenders who personally represented Garre, or from any WCPD Office database.

The "imputed conflict" rule is not clearly established federal law for purposes of § 2254(d)(1). *See Stewart v. Woodford*, 280 F. App'x 575 (9th Cir. 2008); *Lambert*, 393 F.3d at 986. Because the Supreme Court has not addressed imputed disqualification, the issue whether imputed disqualification denies a defendant the right to conflict-free counsel is a matter of state law. *See Mullaney*, 421 U.S. 684 ("state courts are the ultimate expositors of state law"); *Eighth Jud. Dist. Ct. (Zogheib)*, 130 Nev. 158 (holding that, in Nevada, conflicts of interest are not automatically imputed to an entire government office). In determining whether Davis is entitled to habeas relief, I do not consider whether the trial court erred as a matter of state law. *See Estelle v. McGuire*, 501 U.S. 62, 67–68 (1991).

Davis argues that but for the WCPD Office's obligation to keep Garre's files confidential, which obligation continued even after Garre's death, Davis's public defenders could have used

36

Garre's prior offense and psychiatric evaluation records to demonstrate Garre's aggressive conduct. ECF No. 22 at 25.  But as was explained to the trial court at the investigative hearing, the public defenders who personally represented Davis for the second trial were in a position no different than appointed counsel.  Just like appointed counsel, the public defenders who represented Davis could investigate and seek documents and information related to Garre's psychiatric history unhindered by any duties of loyalty to Garre.  It was for this reason the trial court determined there was no conflict of interest and allowed the public defenders to represent Davis. Thus, Davis fails to show prior representation of Garre by other attorneys for the WCPD adversely affected Davis's counsel's performance at trial.

Davis's claim that his counsel's performance was adversely affected by a conflict because his counsel did not investigate and present Garre's prior criminal history and psychiatric evaluation is, at best, speculative.  As stated at the investigative hearing, Davis's trial counsel was no more hindered in their investigation than private counsel would have been hindered.  Moreover, the trial evidence informed the jury that Garre was bipolar, did not use his prescribed medications, used illegal drugs, had methamphetamine and other drugs in his body when he died, had a treating psychiatrist whom the police contacted just before they found Garre deceased inside the house, had beat up Davis and broke his nose, threatened to shoot and kill WCSD deputies with an AK-47 assault rifle such that they would not enter the house to arrest him for beating up Davis, neighbors testified about seeing and hearing Garre act out and yelling, and Davis, his mother, and his sister, were each afraid of Garre.  The trial court excluded testimony from Davis's sister about the time Garre broke her nose even though she told Davis about it.  It is thus speculative to conclude evidence of Garre's psychiatric records, prior acts of violence against others, or Garre's misdemeanor criminal history, would have been admitted as evidence at trial.

I deny Ground 4 because, applying deferential review, the NCA's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on an unreasonable determination of fact considering the evidence presented in the state court proceedings.

### E. Ground 5—Cumulative Error

Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). *See also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining a court must assess whether the aggregated errors, "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting *Donnelly*, 416 U.S. at 643). The cumulative error doctrine, however, does not permit me to consider the cumulative effect of non-errors. *See Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000) ("[W]here there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.").

Although IAC claims are examined separately to determine whether counsel was deficient, the purpose of the Sixth Amendment's guarantee to counsel "is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Strickland*, 466 U.S. at 689, 691–92. The performance inquiry must be whether counsel's assistance was reasonable *considering all the circumstances. See id.* (emphasis added). *See also Boyde v. Brown*, 404 F.3d 1159, 1176 (9th Cir. 2005) ("Prejudice may result from the cumulative impact of multiple deficiencies.") (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978)). The Ninth Circuit Court of

Appeals has held, "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,' the court 'considers counsel's conduct *as a whole* to determine whether it was constitutionally adequate.'" *Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017) (emphasis in original) (quoting in part *Strickland*, 466 U.S. at 690).

In determining whether the cumulative effect of counsel's errors created a due process violation, I must determine "whether the errors rendered the criminal defense 'far less persuasive,' and had a 'substantial and injurious effect or influence' on the jury's verdict." *Parle*, 505 F.3d at 928 (citations omitted). My analysis must consider the combined effect on the outcome, not the impact of each purported error taken alone. *Chambers v. Mississippi*, 410 U.S. 284, 303 (1973) (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"). However, only if the state court's determination of the claim was objectively unreasonable may the evaluation of the errors' impact on the jury verdict follow. *See Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993).

On postconviction review, the NCA determined Davis failed to establish entitlement to relief even if any errors of counsel are considered cumulatively. ECF No. 36-61 at 13–14. The NCA's determination is objectively reasonable. Davis has established no errors to cumulate. Moreover, Davis has not demonstrated trial counsel's performance was, on the whole, ineffective under *Strickland*. Accordingly, I deny Ground 5 of the petition.

## IV.   MOTION FOR LEAVE TO FILE EXHIBITS UNDER SEAL

The respondents move for leave to file under seal Exhibits 218 (Presentence Investigation Report) and 219 (Supplemental Presentence Investigation Report). ECF No. 57. Under Nevada

law, the PSI is "confidential and must not be made a part of any public record." NRS § 176.156(5). Having reviewed and considered the matter in accordance with *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172 (9th Cir. 2006), and its progeny, the compelling need to protect Davis's safety, privacy, and personal identifying information outweighs the public interest in open access to court records. Thus, the motion is granted and Exhibits 218 (ECF No. 58-1) and 219 (ECF No. 58-2) are properly filed under seal.

## V.   CERTIFICATE OF APPEALABILITY

A district court is required to issue or deny a certificate of appealability when it enters a final order adverse to a habeas petitioner, rather than waiting for a notice of appeal and request for certificate of appealability to be filed. Fed. § 2254 R. 11(a); CTA9 Rule 22-1(a). Generally, a petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. 28 U.S.C. § 2253(c)(2); *Slack*, 529 U.S. at 483–84. To meet the threshold inquiry, a petitioner has the burden of demonstrating the issues are debatable among jurists of reason; a court could resolve the issues differently; or the questions are adequate to deserve encouragement to proceed further. *See Allen v. Ornoski*, 435 F.3d 946, 950–51 (9th Cir. 2006).

For claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether my procedural

ruling was correct. *See id.* Applying these standards, a certificate of appealability is warranted for Grounds 3, 4 and 5.

## VI.   CONCLUSION

I THEREFORE ORDER the petitioner's amended petition for writ of habeas corpus **[ECF No. 22] is denied.**

I FURTHER ORDER a certificate of appealability is **granted** for Grounds 3, 4, and 5.

I FURTHER ORDER the Clerk of Court to substitute Manuel Portillo for respondent Jeremy Bean, enter judgment accordingly, and close this case.

Dated: March 8, 2026.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE

41